**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CALVIN DICKEY, SR., & NICOLE DICKEY, individually and as co-administrators of the Estate of Calvin Dickey, Jr., | No. 4:25-CV-02112 |
| | (Chief Judge Brann) |
| Plaintiffs, | |
| v. | |
| BUCKNELL UNIVERSITY, | |
| Defendant. | |

**MEMORANDUM OPINION**

**JUNE 26, 2026**

## I.    BACKGROUND

On November 11, 2025, Plaintiffs Calvin Dickey Sr. and Nicole Dickey (the "Dickeys"), acting in their own capacity and as co-administrators of the Estate of their son, Calvin Dickey, Jr. ("CJ"), filed a two-count complaint against Defendant, Bucknell University ("Bucknell").

On January 9, 2026, Bucknell filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The motion is now ripe for disposition; for the reasons that follow, it is granted in part and denied in part. The Dickeys will be provided leave to amend the complaint.

## II.   DISCUSSION

### A.   Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[1] and *Ashcroft v. Iqbal*,[2] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[3] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[4]

### B.   Facts Alleged in the Complaint

The facts alleged in the complaint, which this Court must accept as true for the purposes of this motion, are as follows.

---

[1]   550 U.S. 544 (2007).
[2]   556 U.S. 662 (2009).
[3]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[4]   *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

When he was in high school, CJ was recruited to play college football at Bucknell.[5] He signed a letter of intent with Bucknell on February 7, 2024.[6] His first day of training camp was set for July 10, 2024.[7]

Before he got started at Bucknell, CJ underwent National Collegiate Athletic Association ("NCAA")-mandated sickle cell trait ("SCT") testing.[8] Complications from SCT was the number one cause of student-athlete deaths during the first decade of the twenty-first century.[9] NCAA guidance indicates the risk of serious injury or death posed by SCT, warning that athletes can experience exertional rhabdomyolysis—a potentially fatal condition—especially if they are pushed to exercise beyond the point where they would normally need to stop and recover.[10] NCAA Sports Medicine Handbook Guideline 2R advises that several exertional precautions should be observed for students with SCT, including permitting them to "set their own pace," "engage in a slow and gradual preseason conditioning regimen," "build up slowly while training," "use adequate rest and recovery between repetitions," "not be urged to perform all out exertion of any kind . . . without a breather," "stop activity immediately upon struggling or experiencing symptoms such as muscle pain, abnormal weakness, undue fatigue, or breathlessness," and

---

[5]    Doc. 1 (Compl.) ¶ 19.
[6]    *Id.* ¶ 20.
[7]    *Id.* ¶ 22.
[8]    *Id.* ¶¶ 13, 21.
[9]    *Id.* ¶ 12.
[10]    *Id.* ¶¶ 26-27.

"stay well hydrated at all times."[11] NCAA Sports Medicine Handbook Guideline 2T warns that the risk of exertional rhabdomyolysis can be increased by "irrationally intense workouts intended to punish or intimidate a team for perceived underperformance," and that "novel overexertion is the single most common cause of exertional rhabdomyolysis and is characterized as too much, too soon, and too fast."[12]

The NCAA issued its Sports Medicine Handbook and several SCT-specific fact sheets to Bucknell prior to the start of camp in 2024.[13] Based on these materials, the Dickeys aver that Bucknell and its relevant employees knew of the danger of SCT, the associated risk factors, and the appropriate precautions.[14]

CJ's SCT test was positive.[15] That result, along with all required medical and physical records, were provided to Bucknell before the start of camp.[16] Bucknell was specifically aware that CJ was positive for SCT and cleared him to play football before camp.[17] Based on his test results and Bucknell's actions and its staff's assurances "as to his health and safety as a SCT-positive student-athlete, CJ . . . relied on . . . Bucknell . . . to protect [him]."[18]

---

[11]   *Id.* ¶ 28.
[12]   *Id.* ¶ 29.
[13]   *Id.* ¶¶ 30-33.
[14]   *Id.* ¶ 34.
[15]   *Id.* ¶ 21.
[16]   *Id.* ¶ 23.
[17]   *Id.* ¶¶ 24-25.
[18]   *Id.* ¶ 26.

On July 8, 2024, CJ traveled with his parents to Lewisburg, Pennsylvania, to move into his dorm room at Bucknell.[19] The next day, he met with Sean Pearson, his offensive line coach, who assured him that the coaching staff would protect him.[20] On July 10, 2024, training camp began.

That first day of camp, strength and conditioning coach Mark Kulbis planned an intense workout for Bucknell's freshmen football players.[21] According to the Dickeys, this was an annual ritual, known at Bucknell as "setting the tone."[22] The workout involved "an unreasonable and excessive number of intense and rigorous calisthenic exercises, including up-downs."[23] The Dickeys aver that Kulbis was known for these workouts, and that Bucknell knew or should have known before the first day of camp about the workouts and Kulbis's failure to confirm that athletes had been medically cleared for participation.[24] Furthermore, they contend that Bucknell knew or should have known before the first day of camp that other athletes "had suffered injuries, including rhabdomyolysis" in Kulbis's summer workouts.[25]

Kulbis allegedly told Jermaine Truax (Bucknell's Vice President, Director of Athletics and Recreation), Tim Pavlechko (Bucknell's Deputy Director of

---

[19]   *Id.* ¶ 43.
[20]   *Id.* ¶ 44.
[21]   *Id.* ¶¶ 17, 41.
[22]   *Id.* ¶¶ 41-42.
[23]   *Id.* ¶¶ 40-41. "An 'up-down' is an exercise where the player is required to repeatedly jump to the ground face down and then bring his body back up to a vertical position." *Id.* ¶ 39.
[24]   *Id.* ¶¶ 37-41.
[25]   *Id.* ¶ 38.

Athletics), Ian Wood (Bucknell's Associate Director of Sports Medicine), David Cecchini (Bucknell's head football coach), Vincent Giacalone (a Bucknell football assistant coach), "and/or" Pearson, about the workout he had planned, stating that he was going to "smoke" the freshmen athletes.[26] The Dickeys allege that Bucknell, through those employees, along with athletic trainers Kaiti Hager and Rayna Murphy, "authorized, permitted, discussed, planned, orchestrated, organized, oversaw, participated in, facilitated, promoted, and/or directed" the workout on the first day of camp.[27] The Dickeys repeatedly state that the purpose of the workout was to "punish[] and . . . initiate" players onto the team, or was a condition for "remain[ing]" thereon,[28] which they contend is "hazing."[29]

CJ attended a team meeting at 11:00 a.m. on July 10, 2024.[30] He met with medical staff at noon, and then the team had a "walkthrough" practice at 1:00 p.m.[31] Following the walkthrough, the freshmen were to report at 3:30 p.m. for what they were told would be "an instructional, light workout" in which they would be taught lifting techniques.[32] At around 3:20 p.m., however, CJ called his mother, Nicole, and

---

[26]  *Id.* ¶ 45.
[27]  *Id.* ¶ 47.
[28]  *Id.* ¶¶ 41-42.
[29]  *Id.* ¶ 48.
[30]  *Id.* ¶ 49.
[31]  *Id.* ¶¶ 49-50.
[32]  *Id.* ¶ 50.

told her that he and nine others had not been cleared to attend the workout.[33] Several minutes later, he called back and said that he had been cleared.[34]

At the workout, coaches, including Kulbis, directed freshman players to do various weight-lifting and calisthenics exercises.[35] Part of the workout included "an unreasonable and excessive number of up-downs," which were imposed as "punishment" "for tardiness, alleged mistakes, and/or 'mess-ups.'"[36] The coaches allegedly provided "no or insufficient water breaks."[37]

CJ began to struggle with the workout.[38] Although he was in visible distress, no member of Bucknell's staff intervened, adjusted the workout, or otherwise helped him.[39] Toward the end of the workout, CJ had to be supported by two teammates while Kulbis addressed the team.[40] Then, CJ collapsed.[41]

After CJ's collapse, several of his teammates ran to get athletic trainers who could help.[42] The Dickeys allege that no trainers were already at the workout, in violation of NCAA bylaws.[43] Kulbis called 911 at 4:43 p.m.[44] According to the

---

[33]   *Id.* ¶ 51.
[34]   *Id.*
[35]   *Id.* ¶ 53.
[36]   *Id.* ¶ 55-57.
[37]   *Id.* ¶ 54.
[38]   *Id.* ¶ 58.
[39]   *Id.* ¶ 59.
[40]   *Id.* ¶ 60.
[41]   *Id.* ¶ 61.
[42]   *Id.* ¶ 63.
[43]   *Id.* ¶ 62.
[44]   *Id.* ¶ 66.

Dickeys, Bucknell's response was further delayed because Bucknell did not have NCAA-mandated Emergency Action Plans that would have guided the response procedure.[45] These delays, the Dickeys contend, deprived CJ of a timely and adequate emergency medical response.[46]

An ambulance responded to Kulbis's call by 4:51 p.m.[47] CJ arrived at Evangelical Community Hospital's emergency department at 5:15 p.m.[48] Hager called the Dickeys at 5:16 p.m. and told them that CJ had collapsed and been transported to Evangelical.[49] The Dickeys rushed to see their son.[50] When they arrived, CJ was conscious and told them that he had passed out after doing up-downs that Kulbis assigned as punishment after he and other freshman had "messed up" on drills.[51]

At Evangelical, CJ was evaluated and diagnosed with rhabdomyolysis, acute renal failure, and tachycardia—symptoms consistent with SCT-related exercise collapse.[52] Later that evening, he was transferred to Geisinger Medical Center to receive a higher level of care.[53] At Geisinger, CJ was placed on dialysis for acute renal failure and administered intravenous fluids and pain and blood pressure

---

[45]   *Id.* ¶¶ 64-65
[46]   *Id.* ¶ 65.
[47]   *Id.* ¶ 66.
[48]   *Id.*
[49]   *Id.* ¶ 68.
[50]   *Id.*
[51]   *Id.* ¶ 70.
[52]   *Id.* ¶ 67.
[53]   *Id.* ¶¶ 67, 71.

medications.[54] Despite the treatment, CJ's condition deteriorated.[55] He developed multi-compartment syndrome on the morning of July 12, 2024, and experienced complications including respiratory failure and repeated cardiac arrest.[56] Geisinger attempted to stabilize him by performing two surgical procedures including a fasciotomy, placing him on extracorporeal membrane oxygenation, and resuscitating him multiple times.[57] The Dickeys observed many of these lifesaving efforts.[58]

On the night of July 12, 2024, Geisinger prepared to perform another fasciotomy.[59] During preparation, CJ again went into cardiac arrest.[60] Medical staff initiated lifesaving efforts, but informed the Dickeys that, based on his condition, CJ's chances of survival were slim.[61] The Dickeys decided to cease lifesaving efforts.[62] CJ died that night.[63]

The Dickeys' complaint asserts that Bucknell is liable for CJ's injuries and death. They bring two Counts against Bucknell. Count I is a claim for negligence. The Dickeys bring both direct and vicarious liability theories, contending that Bucknell negligently hired, retained, and supervised its staff, and that those staff

---

[54]    *Id.* ¶ 72.
[55]    *Id.* ¶ 74.
[56]    *Id.*
[57]    *Id.*
[58]    *Id.* ¶ 76.
[59]    *Id.* ¶ 75.
[60]    *Id.*
[61]    *Id.* ¶ 76.
[62]    *Id.*
[63]    *Id.* ¶ 77.

acted negligently in the course of their employment.[64] Furthermore, they argue that Bucknell and its employees' conduct was "outrageous, grossly negligent, and reckless," "willful and wanton," and "reckless[ly] indifferen[t]."[65] Count II is a claim for negligence *per se*, in which the Dickeys contend that Kulbis's workout constituted hazing that is prohibited by Pennsylvania's Timothy J. Piazza Antihazing Law ("Piazza Law"),[66] and that Bucknell knew about and facilitated or promoted this hazing, also in violation of the Piazza Law.[67]

### C.    Analysis

Bucknell argues that the Dickeys' claims should be dismissed in part. As to Count I, Bucknell contends that the allegations are insufficient to support the direct liability theories, including negligent hiring, retention, and supervision. And Bucknell argues that Count II fails in its entirety. The Dickeys disagree. The Court considers each Count in turn. I partially agree with Bucknell on Count I, and otherwise agree with the Dickeys.

### 1.    Count I – Negligence

Bucknell argues that the Dickeys have not adequately pled facts to support recovery under a direct liability theory, including for negligent hiring, retention, or supervision.[68] The argument is twofold: it contends that the Dickeys did not

---

[64]  *Id.* ¶ 93.
[65]  *Id.* ¶¶ 94-97.
[66]  18 Pa. Cons. Stat. §§ 2801 *et seq.*
[67]  Doc. 1 ¶¶ 102-10.
[68]  Doc. 10 (Mot. to Dismiss Brief) at 11-13.

demonstrate that (1) Bucknell's employees acted outside the scope of their employment with regard to the failure to supervise theory, and (2) Bucknell had reason to know that its employees would act improperly (*i.e.*, their actions were not foreseeable). The Dickeys respond with a threshold procedural argument that Bucknell cannot challenge "theories" of a single claim on a motion to dismiss and attempt to rebut Bucknell's first point on the law and its second on the facts.[69]

### a.    Dismissing Theories

The Dickeys contend that the Court should not consider Bucknell's challenge to Count I because it seeks to dismiss only the "negligent hiring, supervision, and retention claims *within* Count I," rather than the entire Count.[70] They argue that such "piecemeal" challenges are procedurally unavailable in a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, which is focused on "*a claim*."[71]

This issue is far more vexing than either party's brief would suggest.[72] The definition of a "claim," and its distinction from a legal theory, remains a fraught question,[73] and one that treads into territory that, from a District Court's perspective,

---

[69]  Doc. 11 (Opp'n) at 6-13.
[70]  *See* Doc. 10 at 13 (emphasis added).
[71]  Doc. 11 at 7 (emphasis in original).
[72]  The Dickeys offer two paragraphs on the point: one stating the general rule based on out-of-circuit caselaw with minimal elucidation, and a second that conclusorily states that it bars Bucknell's motion here. Doc. 11 at 7-8.
[73]  *See Diaz v. FCA US LLC*, 134 F.4th 715, 720-22, 724-25 (3d Cir. 2025) (Hardiman, J.); *id.* at 727-30 (Phipps, J., dissenting); *Signal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025); *Sherrod v. Wal-Mart Stores, Inc.*, 103 F.4th 410, 413-15 (6th Cir. 2024); *St. Augustine Sch. v. Underly*, 78 F.4th 349, 352 (7th Cir. 2023); *see also* 5

is too heady for its own good. To this District Court, the attempt to divorce the Federal Rules of Civil Procedure's definition of a "claim for relief" from the "legal theories" a plaintiff offers for recovery[74] renders approaches that are inconsistent with the pervasive (indeed, nearly universal) method for handling Rule 12(b)(6) motions to dismiss in the post-*Bell Atlantic Corp v. Twombly*[75] and *Ashcroft v. Iqbal*[76] pleading regime, and portends a reversion to the "simple notice pleading" standard that those cases supposedly disclaimed.[77] After a (likely overly) thorough review, I decline to wade into the Courts of Appeals's project to unwind the controversies raised by *Twiqbal*.[78] Binding precedent answers this question with sufficient clarity to provide a practical path forward, and that is the path that I will take.

As explained above, in *Connelly v. Lane Construction Corp.*, the Third Circuit directed that a court's first step in "reviewing the sufficiency of a complaint" is to "take note of the elements the plaintiff must plead to state a claim."[79] The panel then performed that step by considering the legal elements necessary to impose liability on each legal cause of action the plaintiff had pled, which they described as the

---

Charles Alan Wright, Arthur R. Miller, & A. Benjamin Spencer, Federal Practice & Procedure, Civil § 1216 (hereinafter "5 Wright & Miller") (discussing meaning of a "Claim for Relief").

[74] *Diaz*, 134 F.4th at 724 (quoting *NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992)).

[75] 550 U.S. 544 (2007).

[76] 556 U.S. 662 (2009).

[77] *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[78] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (Nygaard, J.).

[79] 809 F.3d 780, 787 (3d Cir. 2016).

"claims" that were being evaluated.[80] Later, the Court considered each legal cause

of action separately when determining whether the facts alleged were sufficient to

show those actions' elements.[81] This approach follows cleanly from the Supreme

Court's method in *Twombly*, in which the majority described the "claim" as arising

"under § 1 of the Sherman Act," laid out the elements necessary to demonstrate

liability under that provision, and found that the complaint's allegations did not

satisfy those elements,[82] and *Iqbal*, in which the Court "beg[a]n by taking note of

the elements a plaintiff must plead to state a claim of unconstitutional

discrimination."[83] As the Third Circuit explained in its first opinion interpreting

*Twombly*, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can

be summed up as thus: 'stating . . . a claim requires a complaint with enough factual

matter (taken as true) to suggest' *the required element*."[84]

Based on the *Connelly* approach, and its consistency with Supreme Court

precedent, I conclude that a motion to dismiss can attack any legal causes of action

---

[80]   *Id.* at 787-88 (noting a "disparate treatment claim" under Title VII and its elements, one of which can proven in different ways, and a retaliation claims under Title VII and its elements; *Phillips*, 515 F.3d at 235, 243 (noting elements of section 1983 claim and elements of Due Process state-created danger and Equal Protection theories).

[81]   *Id.* at 791-92.

[82]   550 U.S. at 553-70; *see Phillips*, 515 F.3d at 232 ("[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests.").

[83]   556 U.S. at 675.

[84]   *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556); *id.* at 235 ("The complaint at issue in this case clearly satisfies this pleading standard, making a sufficient showing of enough factual matter (taken as true) to suggest the required elements of Phillips' claims.").

asserted in a complaint that have independent elements and relate to a specific subset of facts.[85] And in determining whether a plaintiff's cause of action is sufficiently independent to sustain a Rule 12(b)(6) challenge, the Court must "judge [the] pleading[] not by [its] labels, but by [its] substance."[86] To proceed otherwise would allow savvy plaintiffs to shield more tenuous causes of action from dismissal by hiding them within more general but sufficiently pled counts.[87]

Applying this rule to the present dispute, I find that the Dickeys' causes of action for negligent hiring, supervision, and retention are sufficiently independent that Bucknell's motion to dismiss them is cognizable. Notably, the Dickeys' Count I, labeled only "Negligence," offers theories for recovery based on both "direct" and "vicarious" liability.[88] But Pennsylvania courts have repeatedly explained that these are "distinct" bases for recovery;[89] they require different evidence to prove different elements. Indeed, it is quite common for courts in this Circuit to independently analyze such claims on motions to dismiss,[90] even when they are pled as subparts of

---

[85]  *See* 5B Wright & Miller § 1358 at 604-05 ("A Rule 12(b)(6) motion also may be used to challenge the sufficiency of part of a pleading, such as a single count or claim for relief, although a Rule 12(b)(6) motion may not be used to dismiss only part of a claim."); *see Diaz*, 134 F.4th at 728-29 (Phipps, J., dissenting) (explaining the "critical role of elements" in defining a "claim" and reiterating Majority's contention that *Diaz* is distinct from motion to dismiss context).

[86]  *Khalil v. President, United States*, 164 F.4th 259, 277 (3d Cir. 2026) (citing *Lewis v. Att'y Gen.*, 878 F.2d 714, 722 n.20 (3d Cir. 1989)).

[87]  *See Cnty. of Del. v. Gov't Sys., Inc.*, 230 F. Supp. 2d 592, 597 (E.D. Pa. 2002).

[88]  Doc. 1 ¶ 93.

[89]  *E.g.*, *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. Ct. 2000).

[90]  *Doe v. Loyalsock Twp. Sch. Dist.*, No. 4:21-CV-1343, 2022 WL 1110310, at *6-8 (M.D. Pa. Apr. 13, 2022).

a single "negligence" count.[91] The Dickeys give the game away on this point: their own pleading recognizes that yet another form of negligence, negligence *per se, is* an separate cause of action that can be independently evaluated on a motion to dismiss.[92]

The Dickeys' argument to the contrary does not draw me in. They rely on two decisions from the United States Court of Appeals for the Seventh Circuit,[93] along with several unpublished decisions from out-of-circuit District Courts.[94] But the Seventh Circuit has long taken an independent approach to interpreting *Twiqbal*,[95] and I will not muddle the Third Circuit's (binding) method by attempting to reconcile these distinct lines of law. The District Court opinions are less convincing because, putting aside their lack of precedential value, they are inapposite. *Butler* refused to consider the motion to dismiss because it sought to dismiss discrete factual allegations of discrimination that the defendant argued occurred outside of the limitations period but conceded that some discrimination within the limitations period had been alleged; thus, it attacked allegations pertinent to only *one element*

---

[91]   *Burns v. SeaWorld Parks & Entertainment, Inc.*, 675 F. Supp. 3d 532, 544-49 (E.D. Pa. 2023).
[92]   Doc. 1 at 30 ("Count II" "Negligence Per Se").
[93]   Doc. 11 at 7-8 & n.1 (citing *Signal Funding*, 136 F.4th 718 and *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015))
[94]   *Id.* (citing *Butler v. Salt Lake City Sch. Dist.*, No. 2:20-CV-154, 2020 WL 3104971, at *2 (D. Utah June 11, 2020) and *T5.2 Ltd. v. Citrix Sys., Inc.*, No. 24-CV-62093, 2025 WL 3297748, at *4 (S.D. Fla. Sept. 29, 2025)).
[95]   *See* 5 Wright & Miller § 1216 at 219-21 (discussing Seventh Circuit's approach and citing *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008)); *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012) (holding that a party "may elaborate on her allegations" on appeal "so long as the elaborations are consistent with the pleadings");

of a legal theory, rather than a theory in its entirety.[96] *T5.2* was a *rejected* Report and Recommendation[97] that rejected a motion challenging the *element* of patentability as to specific patent claims that were asserted in separate counts, without attempting to demonstrate that the element was entirely unmet.[98]

The Dickeys' argument elevates form over substance and incentivizes artful pleading. Taking a realistic view of the complaint, Bucknell's attack on the direct liability theories is cognizable on a motion to dismiss.

### b.    Scope of Employment

Proceeding to the substantive arguments, Bucknell contends that the Dickeys' negligent hiring, retention, and supervision claims should fail because they have not alleged that Bucknell's employees acted outside the scope of their employment in causing Plaintiffs' injury.[99] But demonstrating that the injury resulted from conduct beyond the scope of employment is not a necessary element of these claims. True,

---

[96] 2020 WL 3104971, at *2 ("Defendant seeks dismissal of those portions of Plaintiff's claims that relate to discrete discriminatory acts that occurred before May 19, 2015."); *see id.* (using "causes of action" and "claims" interchangeably); *BBL*, 809 F.3d at 323-26 (discussing impropriety of granting judgment on the pleadings on "*certain elements* of the doctrinal test applicable to the First Amendment claim." (emphasis in original)); *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, No. 15-CV-137, 2017 WL 1349175, at *6-8 (D. Del. Apr. 10, 2017) (distinguishing *BBL* because it involved "a motion of judgment on the pleadings (or a motion to dismiss) as to certain *legal elements of a claim*").

[97] *See T5.2 Ltd. v. Citrix Sys., Inc.*, No. 24-CV-62093, 2025 WL 3905138 (S.D. Fla. Nov. 17, 2025) (rejecting Report and Recommendation).

[98] 2025 WL 3297748, at *1-2 (explaining that motion to dismiss "analyzes one claim of each Patent without establishing that those claims are representative of the other 153 claims of the Patents that are at issue").

[99] Doc. 10 at 11-13 (citing *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 487-88 (3d Cir. 2013)).

the Third Circuit in *Belmont v. MB Inv. Partners, Inc.* stated the issue as an element,[100] but it also recognized that Pennsylvania courts similarly rely on the rule of liability set forth in "Section 213 of the Restatement (Second) of Agency," which does not require that the employee be acting outside the scope of his employment.[101]

Pennsylvania's actual scheme regulating an employer's liability for its employee's conduct involves an overlapping web of theories that seem to cover all possible grounds of misconduct. Recalling basic tort law, "under the doctrine of vicarious liability, the corporation, not the employee, is liable for acts committed by the employee *in the course of employment*."[102] This liability is automatic and applies without regard to the employer's fault.[103] The theories of negligent hiring, supervision, and retention are designed to reach further, and "provide a remedy to injured third parties who would otherwise be foreclosed from recovery under the master-servant doctrine because the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the master's

---

[100] *Belmont*, 708 F.3d at 488 (citing *Dempsey v. Walso Bureau, Inc.*, 246 A.2d 418, 420 (Pa. 1968)).

[101] *Id.* at 488 n.23 (citing *Heller v. Patwil Homes, Inc.*, 713 A.2d 105, 107 (Pa. Super. Ct. 1998)).

[102] *Salsberg v. Mann*, 310 A.3d 104, 123 (Pa. 2024) (quoting *Tayar v. Camelback Ski Corp., Inc.*, 47 A.3d 1190, 1196 (Pa. 2012)) (using proposition by analogy but citing relevant authority); *Aiello v. Ed Saxe Real Estate, Inc.*, 499 A.2d 282, 559 (Pa. 1985); *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979).

[103] *Williams v. Nancy J. Shattuck Real Estate & Assocs., LLC*, 324 A.3d 1232, at \*15 n.21 (Pa. Super. Ct. July 16, 2024) (unpublished table decision) (citing *Shuman Estate v. Weber*, 419 A.2d 209, 215 (Pa. Super. Ct. 1980)).

business."[104] These theories of liability *are* premised on the employer's own misconduct.[105]

Given the reach of vicarious liability and the relative ease with which it is established, a plaintiff generally does not need—and has no incentive—to pursue one of the direct liability theories when it is clear that the employee was acting within the scope of his employment. Indeed, parties have argued before that the two theories do not overlap, and that direct liability claims should be dismissed once a basis for vicarious liability is established.[106] Many federal courts in Pennsylvania have applied such a rule.[107] But the rule essentially serves the purpose of simplifying the case and avoiding the threat of duplicative recovery[108]—it is not, as Bucknell would have it, because the theories of liability are entirely non-overlapping.

---

[104] *Heller*, 713 A.2d at 107 (citing *Welsh Mfg., Div. of Textron v. Pinkerton's*, 474 A.2d 436, 439 (R.I. 1984)).

[105] *Brezenski*, 755 A.2d at 39-40 (citing *Dempsey*, 410 A.2d 1270).

[106] *Burke v. TransAm Trucking, Inc.*, 605 F. Supp. 2d 647, 657 (M.D. Pa. 2009).

[107] *See Tjokrowidjojo v. San Lucas*, 2021 WL 1143379, at *2 (E.D. Pa. 2021 Mar. 25, 2021) (citing cases).

[108] *See James v. Kelly Trucking Co.*, 661 S.E.2d 329, 330-332 (S.C. 2008) (holding that *respondeat superior* and negligent hiring claims could proceed based on same conduct and explaining that counterarguments were based on concerns about admission of prejudicial evidence of employee's past negligence); *Ferrer v. Okbamicael*, 390 P.3d 836, 842-46 (Colo. 2017) (reaching opposite conclusion but identifying same concerns that "where an employer has conceded it is subject to *respondeat superior* liability for its employee's negligence, direct negligence claims against the employer that are nonetheless still tethered to the employee's negligence become redundant and wasteful" because they are "superfluous," risk admission of "unfairly prejudicial" evidence, and hold the potential for an "award [of] duplicative damages"); *Sterner v. Titus Transp., LP*, 2013 WL 6506591, at *3-4 (M.D. Pa. Dec. 12, 2013) (collecting cases)

To reconcile these similar but "distinct" causes of action,[109] in the absence of guidance from the Pennsylvania Supreme Court,[110] Pennsylvania's federal courts have held that the general rule precluding the overlapping actions gives way "when a plaintiff has made punitive damages claims against the supervisor defendant,"[111] even if "the supervisor/employer admits that its employee was acting within the scope of his or her employment at the time of the accident."[112] Under this theory, then, a plaintiff can maintain a punitive damages action against an employer under a direct liability theory even if the employee was acting within the scope of his employment when he injured the plaintiff; it is a recognition of the possibility that an employer may be so indifferent to the likely consequences of hiring, not supervising, or failing to fire an incompetent or dangerous employee that it should be punished for its own bad decision.[113]

Bucknell's argument on this point is a purely legal one. It does not contend that the allegations are insufficient to state a claim for punitive damages. Thus, the Court does not consider the sufficiency of the complaint as to a punitive damages claim. The Dickeys may proceed with both direct and vicarious theories of liability.

---

[109]    *Brezenski*, 755 A.2d at 39.

[110]    *See Tjokrowidjojo*, 2021 WL 1143379, at *2.

[111]    *Id.* (quoting *Testa v. Senn Freight Lines, Inc.*, 2016 WL 465459, at *3 (E.D. Pa. Feb. 8, 2016)).

[112]    *Testa*, 2016 WL 465459, at *3 (quoting *Sterner*, 2013 WL 6506591, at *4).

[113]    *See Sterner*, 2013 WL 6506591, at *5 (quoting *Allen v. Fletcher*, 2009 WL 1542767, at *4-5 (M.D. Pa. June 2, 2009)); *Hutchison v. Luddy* ("*Hutchison II*"), 870 A.2d 766, 769-73 (Pa. 2005).

### c.    Foreseeability

The theories of direct liability set forth in section 317 of the Restatement (Second) of Torts and section 213 of the Restatement (Second) of Agency both require a plaintiff to show that an employer "knows or should know of the necessity and opportunity for exercising . . . control" over its tortfeasor-employee.[114] In other words, the plaintiff must show that it was foreseeable to the employer that the tortfeasor-employee would commit the tort at issue and cause the harm sustained.[115] More specifically, "[a]n employer knows, or should know, of the need to control an employee if the employer knows that the employee has dangerous propensities that might cause harm to a third party."[116] The Dickeys' complaint contains facts sufficient to meet this element as to negligent supervision and retention, but not hiring.

The Dickeys allege that, each year, Bucknell's football coaches required new players to complete excessive and extreme physical workouts at the beginning of the season. That this was a regular and known occurrence is easily inferred from the allegations that Kulbis told other coaches and employees about the workout he had planned for the freshmen in 2024 without receiving any pushback and the description

---

[114] Restatement (Second) Torts § 317(b); Restatement (Second) Agency § 213 cmt. d ("The principal may be negligent *because he has reason to know* that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him."); *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 487-88, 491-92 (3d Cir. 2013) (internal citations omitted).

[115] *Belmont*, 708 F.3d at 491 (internal citations omitted).

[116] *Id.* (citing *Hutchison v. Luddy* ("*Hutchison I*"), 742 A.2d 1052, 1057-58 (Pa. 1999)).

of this type of workout as "setting the tone."[117] These specific facts, paired with the more general allegations that these workouts were an annual occurrence,[118] are sufficient to show that Bucknell knew or should have known that their employees would continue to engage in this conduct. Furthermore, the risk of CJ's rhabdomyolysis and subsequent complications was also readily foreseeable in light of the many NCAA materials warning about such conditions resulting from overly strenuous workouts.[119] However, these allegations relate only to ongoing conditions at Bucknell. Nothing in the complaint indicates that any of Bucknell's employees was known for engaging in similar conduct before coming to Bucknell, as would be necessary to show that the employees' "dangerous propensities" were known when they were hired.[120] Thus, the Dickeys have stated claims that Bucknell was negligent in overseeing the actions of its employees. But they have not shown that it was negligent when it hired them.

Bucknell's motion to dismiss is therefore granted as to the cause of action for negligent failure to hire and is otherwise denied.

---

[117] Doc. 1 ¶¶ 42, 45

[118] *Id.* ¶¶ 40-41.

[119] *Id.* ¶¶ 27-33; *see Belmont*, 708 F.3d at 491 ("A harm is foreseeable if it is part of a general type of injury that has a reasonable likelihood of occurring." (*citing Serbin v. Bora Corp., Ltd.*, 96 F.3d 66, 72 (3d Cir. 1996))).

[120] Allegations of prior similar behavior are generally conclusory and all merely allege the conduct occurred before the July 10th workout, rather than before the employees were hired. Doc. 1 ¶¶ 37-38, 40-41,

### 2.    Count II – Negligence *Per Se*

The doctrine of negligence *per se* "provides that the violation of 'an applicable statute, ordinance, or regulation designed to prevent a public harm' establishes 'the elements of duty and breach of duty' in a negligence claim."[121] A negligence *per se* claim requires proof of four elements: "(1) [t]he purpose of the statute [is], at least in part, to protect the interest of a group of individuals, as opposed to the public generally; (2) [t]he statute or regulation . . . clearly appl[ies] to the conduct of the defendant; (3) [t]he defendant . . . violate[d] the statute or regulation; and (4) [t]he violation of the statute or regulation . . . proximate[ly] cause[d] . . . the plaintiff's injuries."[122] "An applicable statute, meaning one that can serve as the basis for a negligence per se claim, then, is one that 'clearly indicate[s] an intention to protect specific groups from specific types of harm.'"[123]

Bucknell agrees that elements 1 and 2 of this test are met with regard to the Piazza Law,[124] acknowledging that courts in Pennsylvania have consistently held that the provision is designed to protect student/minor group members (including athletes) and applies to the conduct of Universities.[125] Bucknell disputes element 3,

---

[121] *Burns*, 675 F. Supp. 3d at 544-45 (quoting *Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. 2014)).

[122] *Id.* at 545.

[123] *Id.* (quoting *Schemberg*, 85 A.3d at 1075).

[124] 18 Pa. Cons. Stat. §§ 2802 *et seq.*

[125] Doc. 10 at 13 (citing *Jean v. Bucknell Univ.*, 534 F. Supp. 3d 404, 415 n.88 (M.D. Pa. 2021)); *Humphries v. Pa. State Univ.* ("*Humphries I*"), 492 F. Supp. 3d 393, 404-05 (M.D. Pa. 2020); *see J.R. ex rel. Mr. R.R. v. Greater Latrobe Sch. Dist.*, 688 F. Supp. 3d 243, 257-58 (W.D. Pa. 2023) (high school).

however, contending that the complaint does not contain facts to show that it violated the Piazza Law.

As I have explained before, to demonstrate a violation of the Piazza Law, a plaintiff must show that he was injured by conduct that constitutes "the offense of hazing."[126] The statutorily defined offense of hazing, in turn, consists of two elements: (1) hazing conduct, which in the context of this case would include "brutality of a physical nature, including whipping, beating, branding, calisthenics or exposure to the elements" and "any other activity that creates a reasonable likelihood of bodily injury"; and (2) hazing purpose, meaning that the conduct was undertaken "for the purpose of initiating, admitting, or affiliating a minor or student into or with an organization, or for the purpose of continuing or enhancing a minor or student's membership or status in an organization."[127] Notably, the statute further provides that "hazing shall not include reasonable and customary athletic, law enforcement or military training, contests, competitions, or events" (the "athletic training exception").[128] Bucknell argues that the alleged facts do not meet either of the elements of hazing and, if they do, the athletic training exception applies. I disagree.

---

[126] *Humphries v. Pa. State Univ.* ("*Humprhies II*"), No. 20-CV-0064, 2021 WL 4355352, at *18-19 (M.D. Pa. Sept. 24, 2021) (quoting 18 Pa. Cons. Stat. § 2802).
[127] *Id.* (quoting 18 Pa. Cons. Stat. § 2802)
[128] 18 Pa. Cons. Stat. § 2802(c).

First, I analyze the brutality element and athletic training exception together. These statutory elements are obviously related: calisthenics are a violation of the statute when they can be considered "brutal," but are permissible when they are reasonable and a customary part of athletic training.[129] So, in any context, not all physical exertion is actionable—only that which is sufficiently severe will violate the law.[130] The athletic training exception indicates that, in "athletic, law enforcement and military training," the standard for what constitutes actionable physical exertion may be higher, as long as the exertion is reasonable and related to the activity for which the minor or student is training.[131] Bucknell contends that the complaint lacks sufficient detail to show that the July 10th workout was actionably brutal,[132] and instead only shows "a football conditioning session" that did not "deviate from reasonable or customary athletic training practices."[133]

Although it is not incredibly detailed, the Dickeys' complaint contains sufficient facts to find that the brutality element is satisfied. Contrary to Bucknell's contention that the Dickeys have simply offered "conclusory assertions that mirror the statutory language,"[134] the Dickeys have explained specific ways in which the July 10th workout was brutal: the players were misled about the intensity of the

---

[129]  18 Pa. Cons. Stat. §§ 2802(a)(3), (c).
[130]  *Id.* § 2802(a)(3).
[131]  *Id.* § 2802(c).
[132]  Doc. 10 at 16.
[133]  *Id.* at 20.
[134]  *Id.* at 16.

workout—which was their first of the season—and then required to perform an "extreme and excessive number" of up-downs and other exercises with few or no water breaks.[135] The players were required to continue these exercises beyond the point of visible distress.[136] That the Dickeys have not pled the specific "number of up-downs performed" is not a cognizable defect: they have pled that, whatever the number, it was excessive.[137] No more "detailed factual allegations" are necessary.[138] Moreover, from these facts the Court can reasonably infer that the July 10th workout may have deviated from what would be a reasonable and customary workout under the circumstances such that the athletic training exception would not apply.[139] And, ultimately, that determination is generally one for the jury to make after discovery has developed facts about what a reasonable and customary workout would look like.[140] Whether the facts will ultimately show that the workout was unreasonable remains to be seen, but for now, the allegations are sufficient to proceed to discovery.

Next, I consider the hazing purpose requirement. Bucknell contends that, on the Dickeys' complaint, the July 10th workout's up-downs and calisthenics were not

---

[135]  Doc. 1 ¶¶ 50, 54, 57-58.
[136]  *Id.* ¶ 59.
[137]  The Court also notes that it is in no position to evaluate whether a specific number of up-downs is excessive in the absence of some baseline, which necessarily requires development of the factual record and potentially expert testimony.
[138]  *Twombly*, 550 U.S. at 555.
[139]  *Iqbal*, 556 U.S. at 678.
[140]  *McNally v. Liebowitz*, 445 A.2d 716, 721 (Pa. 1982); *see Flickinger's Estate v. Ritsky*, 305 A.2d 40, 43 (Pa. 1973). The Court takes specific note of the fact that discovery would proceed in this matter even if Bucknell's motion were granted in full.

ordered "for the purpose of initiating, admitting, or affiliating" players with the team,[141] because the workouts were imposed as "punishment" for mistakes and were therefore "*punitive*, not initiatory."[142] I will not dally on this facile argument. The complaint does allege that the up-downs were "intended to serve as punishment,"[143] but the allegations lead to the obvious inference that these "punishments" were disproportionate to the violations or entirely contrived,[144] and were imposed in order to "set[] the tone" on the first day of practice.[145] These allegations are sufficient to support an inference that Kulbis was initiating players by subjecting them to excessive punishments on the first day of practice. That establishes a hazing purpose under the Piazza Law.

The allegations support both elements of a Piazza Law violation and show that the athletic training exception may not apply. Accordingly, Bucknell's motion to dismiss the negligence *per se* claim based on the Piazza Law is denied.

## III. CONCLUSION

Bucknell's motion to dismiss pursuant to Rule 12(b)(6) is granted as to the negligent hiring claim and otherwise denied. The Dickeys are granted leave to amend. "The Federal Rules of Civil Procedure do not address the situation in which

---

[141] Doc. 10 at 17 (quoting *Humphries II*, 2021 WL 4355352, at *20).
[142] *Id.* at 18.
[143] Doc. 1 ¶¶ 55-56.
[144] *Id.* ¶ 55 (describing violations as "tardiness, *alleged* mistakes, and/or 'mess-ups'" (emphasis added)).
[145] *Id.* ¶ 42.

26

a deficiency in a complaint could be cured by amendment but leave to amend is not sought."[146]  But the law in the Third Circuit is clear that leave to amend should be "freely given" regardless of whether leave is specifically requested.[147] The Dickeys may be able to allege additional facts to show that Bucknell knew of its employees' "dangerous propensities" before hiring them, such that the negligent hiring claim can proceed. Moreover, if they choose to amend, the Dickeys should take the opportunity to reorganize their pleading to at least distinguish their vicarious and direct theories of negligence.

As such, Plaintiff will be given fourteen days from today's date to file an amended complaint. If no amended complaint is filed, Bucknell will have fourteen days from that deadline to file its answer to the remaining claims.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[146] *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000).
[147] *Id.* (quoting Fed. R. Civ. P. 15(a)).